IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | | |
|---|---|---|
| **DERRICK EVANS** § | | **PLAINTIFF** |
| § | | |
| v. § | | Civil No. 1:19-cv-536-HSO-RHWR |
| § | | |
| **HUFFINGTON POST.COM, INC.,** § | | |
| *and* **ASHLEY FEINBERG** § | | **DEFENDANTS** |

<u>**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS HUFFINGTON POST.COM, INC., AND ASHLEY FEINBERG'S MOTION [42] TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(2)**</u>

BEFORE THE COURT is Defendants Huffington Post.Com, Inc., and Ashley Feinberg's Motion [42] to Dismiss for Lack of Personal Jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). After due consideration of the Motion [42], the record, the pleadings, and relevant legal authority, the Court finds that Defendants' Motion [42] should be granted, and that this case should be dismissed without prejudice for lack of personal jurisdiction.

I.  <u>BACKGROUND</u>

A.  <u>Factual background</u>

Plaintiff Derrick Evans ("Plaintiff" or "Evans") is "a teacher and civil rights and environmental justice advocate" who asserts that he is a Mississippi resident. Compl. [1] at 1. Evans attended Georgetown Preparatory School in North Bethesda, Maryland, beginning in 1982 on a full academic scholarship. *Id.* at 6. After high school, Evans attended Boston College where he earned bachelor's and master's degrees in "History, Education, and African-American Studies." *Id.* Following

graduation, Evans held a number of jobs, including teaching at the middle school and collegiate levels in the Boston area until 2005. Ex. 1 [45-1] at 66-69. Since then, Evans has supported himself by leasing various rental properties while living in both Mississippi and Massachusetts. *Id*. at 69; Ex. 2 [45-2] at 1-3.

Huffington Post.Com, Inc. ("Defendant" or "HuffPost"), is a corporation formed under the laws of Delaware with its principal place of business in New York, which operates "a global online news and media platform, with United States and international editions." Ex. 2 [42-1] at 2; Compl. [1] at 3-4. On September 20, 2018, HuffPost published an article (the "Article") on its website entitled "Former Student: Brett Kavanaugh's Prep School Party Scene Was a 'Free-For-All.'" Compl. [1] at 7; Ex. 2 [1-2] at 1. The Article was written by Defendant Ashley Feinberg ("Feinberg"), a HuffPost reporter and New York resident. Compl. [1] at 4.

Evans alleges in his Complaint [1] that HuffPost published the Article on its website during the Senate confirmation hearings for United States Supreme Court Associate Justice Brett Kavanaugh. *Id*. at 7-8. Evans asserts that the Article characterized the school as a "free-for-all party scene," *id*. at 8; 2 Ex. 2 [1-2] at 1, and, among other things, referenced the April 1984 overdose death from cocaine, Demerol, and Mellaril of David Kennedy, son of the late Senator Robert F. Kennedy. Ex. 2 [1-2] at 1. Based on an anonymous source, the Article asserted that "[t]wo Prep students – David's brother Doug, and his friend Derrick Evans – had helped David Kennedy score the coke." Ex. 2 [1-2] at 1. On September 24, 2018, the reference to Evans was removed and a correction was issued, stating that the

2

Article "previously mischaracterized the involvement of individuals in a drug purchase." Compl. [1] at 14; Ex. 4 [1-4] at 3.

B. <u>Procedural history</u>

On August 21, 2019, Evans filed suit in this Court, invoking diversity of citizenship as the basis for federal subject-matter jurisdiction. *Id*. at 4. Evans named as Defendants HuffPost and Feinberg (collectively "Defendants"), and advanced claims against them for defamation. Specifically, Evans alleges that HuffPost and Feinberg "published to third parties statements of purported fact of and concerning" him which portrayed him as having participated in the procurement of an illegal substance that resulted in David Kennedy's death. *Id*. at 15. Evans avers that these statements were false, had a defamatory effect, and constituted libel per se. *Id*. Evans further claims that these statements harmed his reputation and caused him emotional distress. *Id*. at 16.

In lieu of answering, on October 16, 2019, Defendants filed a Motion [8] to Dismiss for Lack of Personal Jurisdiction, to which Evans responded by filing a Motion [10] for Jurisdictional Discovery. The Court granted Plaintiff's Motion [10] for Jurisdictional Discovery and denied Defendants' Motion [8] to Dismiss without prejudice with leave to reassert, and permitted the parties to conduct discovery on the question of the Court's personal jurisdiction over Defendants. Order [18] at 9-10.

Shortly thereafter, Defendants filed their own Motion [19] for Jurisdictional Discovery which the Court granted, allowing the parties to engage in discovery to

determine "whether personal jurisdiction [over Defendants] exists under the tort prong of the Mississippi long-arm statute." Order [27] at 8-9.

Upon the conclusion of discovery, Defendants have now renewed their Motion [42] to Dismiss for Lack of Personal Jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). Defendants argue that the Court lacks jurisdiction over them under both the Mississippi long-arm statute and under the Due Process Clause of the Fourteenth Amendment. Mem. [43] at 4-5. For purposes of the long-arm statute, Defendants contend that they did not commit any part of a tort in Mississippi and that they were not doing any business in Mississippi. *Id.* at 6-13. They further maintain that the Court lacks specific jurisdiction over them because neither Defendant had sufficient "minimum contacts" with Mississippi and Evans's claims do not arise from any of their activities in the State. *Id.* at 13-20.

In response, Evans contends that the Mississippi long-arm statute confers jurisdiction over HuffPost under the tort and doing-business prongs. Mem. [46] at 15-22. Specifically, Evans asserts that he was injured in Mississippi by HuffPost's publication of the defamatory Article and that HuffPost conducted business in Mississippi by way of its "highly interactive" website. *Id.* at 17-22. Evans also argues that HuffPost's data mining operation, designed to tailor advertisements based on the user's location, sufficiently targeted Mississippi, and that there is a sufficient nexus between these contacts and the defamatory Article such that the Court's exercise of jurisdiction would not offend traditional notions of fair play and substantial justice. *Id.* at 32. Evans does concede that this Court lacks personal

jurisdiction over Feinberg, and based upon this concession the Court will grant Defendants' Motion [42] as to Feinberg. *Id.* at 2 n. 1.

## II. DISCUSSION

A. <u>Legal standard</u>

Federal Rule of Civil Procedure 12(b)(2) provides the vehicle through which personal jurisdiction may be challenged. Fed. R. Civ. P. 12(b)(2). "Where a court finds it lacks personal jurisdiction, it may dismiss the action pursuant to Federal Rule of Civil Procedure 12(b)(2)." *Herman v. Cataphora, Inc.*, 730 F.3d 460, 466 (5th Cir. 2013). "[T]he party seeking to invoke the power of the court . . . bears the burden of establishing jurisdiction but is required to present only prima facie evidence." *Pervasive Software, Inc. v. Lexware GMBH & Co. KG*, 688 F.3d 214, 219 (5th Cir. 2012) (quotation omitted). In assessing whether a prima facie case exists on a motion to dismiss, the Court "must accept as true [the Plaintiff's] uncontroverted allegations and resolve in [its] favor all conflicts between the [jurisdictional] facts contained in the parties' affidavits and other documentation." *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 343 (5th Cir. 2004) (alterations in original) (quoting *Nuovo Pignone, SpA v. STORMAN ASIA M/V,* 310 F.3d 374, 378 (5th Cir.2002)) (internal quotation marks omitted); *Revell v. Lidov*, 317 F.3d 467, 469 (5th Cir. 2002) ("In considering a motion to dismiss for lack of personal jurisdiction, a district court may consider affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery.") (quotation omitted).

This Court must employ a two-step analysis to determine whether personal jurisdiction exists. *ITL Int'l, Inc. v. Constenla, S.A.*, 669 F.3d 493, 496 (5th Cir. 2012). First, it must consider whether Defendants are amenable to suit under the Mississippi long-arm statute. *Id.* at 496-97. Then, it examines whether the exercise of personal jurisdiction over Defendants comports with the Due Process Clause of the Fourteenth Amendment. *Id.* at 497.

B.   Evans's claims against Feinberg

Evans admits that "this Court lacks personal jurisdiction over Defendant . . . Feinberg because other than authoring the defamatory Article, there is no evidence she has any involvement with the operation of HuffPost's website and the publication of the Article on that website." Mem. [46] at 2 n. 1. As such, Evans has conceded his defamation claims against Feinberg, and the Court will dismiss Evans's claims against Feinberg without prejudice for lack of personal jurisdiction.

C.   Evans's claims against HuffPost

1.   Mississippi's long-arm statute

"Federal Rule of Civil Procedure 4(k)(1)(A) provides personal jurisdiction over any defendant who would be subject to personal jurisdiction under the long-arm statute of the state in which the district court sits." *ITL Int'l, Inc.*, 669 F.3d at 497.

The Mississippi long-arm statute provides, in pertinent part, as follows:

> Any nonresident person, firm, general or limited partnership, or any foreign or other corporation not qualified under the Constitution and laws of this state as to doing business herein, who shall make a contract with a resident of this state to be performed in whole or in part by any party in this state, or who shall commit a tort in whole or in part in this state against a resident or nonresident of this state,

6

> or who shall do any business or perform any character of work or service in this state, shall by such act or acts be deemed to be doing business in Mississippi and shall thereby be subjected to the jurisdiction of the courts of this state.

Miss. Code Ann. § 13-3-57. The Mississippi Supreme Court has recognized "three activities" under the statute which will allow Mississippi courts to exercise personal jurisdiction over a nonresident defendant: "(1) if that person has entered into a contract to be performed in Mississippi; (2) has committed a tort in Mississippi; or, (3) is conducting business in Mississippi." *Dunn v. Yager*, 58 So. 3d 1171, 1184 (Miss. 2011) (quoting *Yatham v. Young,* 912 So. 2d 467, 469–70 (Miss. 2005)). "The three prongs of the long-arm statute are commonly referred to as the contract prong, the tort prong, and the doing-business prong." *ITL Int'l, Inc.*, 669 F.3d at 497.

Evans contends that HuffPost, as a nonresident defendant, is amenable to personal jurisdiction in Mississippi under both the tort prong and the doing business prong, Mem. [46] at 15-22, while HuffPost maintains that neither prong is applicable, Mem. [43] at 4; Reply [49] at 4. Because the Court finds that Evans cannot establish personal jurisdiction over HuffPost under the Due Process Clause, it will assume, without deciding, that Evans can make a prima facie showing that HuffPost is amenable to suit under the Mississippi long-arm statute.

2. The Fourteenth Amendment Due Process Clause

a. Legal framework

"The Due Process Clause of the Fourteenth Amendment constrains a State's authority to bind a nonresident defendant to a judgment of its courts." *Walden v.*

7

*Fiore,* 571 U.S. 277, 283 (2014) (citing *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291 (1980)). A physical presence by the nonresident defendant within the territorial jurisdiction is not required. *Id.* However, a plaintiff must show that a defendant has "certain minimum contacts with [Mississippi] such that maintenance of the suit does not offend the traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quotation omitted).

Personal jurisdiction may be general or specific. *Admar Int'l, Inc. v. Eastrock, L.L.C.*, 18 F.4th 783, 786 (5th Cir. 2020). "Specific jurisdiction exists when the nonresident defendant's contacts with the forum state arise from, or are directly related to, the cause of action. General jurisdiction exists when a defendant's contacts with the forum state are unrelated to the cause of action but are 'continuous and systematic.'" *Id.* (quoting *Mink v. AAAA Dev. L.L.C.*, 190 F.3d 333, 335 (5th Cir. 1999)). In this case, Evans relies only on specific jurisdiction. Mem. [46] at 22-23.

Specific jurisdiction under due process requires: "(1) minimum contacts by the defendant purposefully directed at the forum state; (2) a nexus between the defendant's contacts and the plaintiff's claims; and (3) that the exercise of jurisdiction over the defendant be fair and reasonable." *ITL Int'l, Inc.*, 669 F.3d at 498; *see McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009). The United States Court of Appeals for the Fifth Circuit has held that, in cases such as this one involving the Internet, the analysis "should not be different at its most basic level

from any other personal jurisdiction case." *Pervasive*, 688 F.3d at 226 (quotation omitted). To determine whether a website can create sufficient minimum contacts, the Fifth Circuit employs the approach set forth in *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997). *Revell*, 317 F.3d at 470.

b.  The *Zippo* sliding scale approach

The *Zippo* approach utilizes a "sliding scale" to measure a website's connections to a forum state. *Id.* (citing *Zippo*, 952 F. Supp. at 1124). At one end of the spectrum, personal jurisdiction is proper "where a defendant clearly does business over the Internet by entering into contracts with residents of other states which involve the knowing and repeated transmission of computer files over the Internet." *Mink*, 190 F.3d at 336 (internal quotation marks omitted) (quoting *Zippo*, 952 F. Supp. at 1124). At the other end, a court lacks personal jurisdiction "where a defendant merely establishes a passive website that does nothing more than advertise on the Internet." *Id.* "Between those extremes, purposeful availment turns on the level of interactivity and commercial nature of the exchange of information that occurs on the [website]." *Admar*, 18 F.4th at 786.

Here, Evans argues that the facts, as set forth in the Complaint and in the jurisdictional evidence submitted by the parties, demonstrate that HuffPost's website fits in the middle category. Mem. [46] at 23; Compl, [1] at 4-5; Ex. 7 [45-7] at 16-18. Evans asserts that HuffPost's website is "highly interactive," as it allows its users to post comments on articles and purchase merchandise through its

9

affiliates.[1] Mem. [46] at 6-8; *see also* Ex. 2 [42-2] at 3; Ex. 6 [45-6] at 4. In addition, by visiting HuffPost's website the user agrees to its "Terms of Services." Mem. [46] at 8; *see generally* Ex. 5 [45-5]. HuffPost also collects data from each visitor by using cookies and "other technologies," obtaining data from users who have registered with HuffPost, and obtaining data from the "setting of the device being used" to visit its website. Ex. 7 [45-7] at 16-19.

The Court finds that the foregoing is sufficient to establish that HuffPost operates an interactive website that falls in the intermediate *Zippo* category. *See, e.g., Revell*, 317 F.3d at 472 (finding an online bulletin board fell in the middle of the *Zippo* sliding scale where visitors were allowed to "participate in an open forum hosted by the website"); *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 319 (5th Cir. 2021) (holding in a similar case that HuffPost operates an interactive website). Consequently, the Court must apply the "usual tests to determine whether the virtual contacts that give rise to the plaintiff's suit arise from the defendant's purposeful targeting of the forum state." *Johnson*, 21 F.4th at 318 (citing *Revell*, 317 F.3d at 472-76).

c.  The *Calder* effects test

To answer this question in Internet libel cases, the Fifth Circuit has turned to the United States Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783 (1984), to assess whether the publisher targeted the alleged libel at the forum state.

---

[1] HuffPost has acknowledged that its users can purchase items from its "Shopping" portal by accessing links to its "affiliate network partnerships." Ex. 6 [45-6] at 4. However, it contends that it did not generate any revenue from these affiliates in 2018. Reply [49] at 11 (citing Ex. 1 [42-1]).

10

*Id*. *Calder* requires that the forum state be the "focal point both of the story and of the harm suffered." *Calder*, 465 U.S. at 789; *see also Herman*, 730 F.3d at 465 ("In applying the *Calder* analysis, we have emphasized the importance of the 'focal point' language . . . . [F]or minimum contacts to be present the allegedly defamatory statements must be adequately directed at the forum state." (citation omitted)). *Calder* held that California courts had jurisdiction over two nonresident defendants, because:

> [t]he allegedly libelous story concerned the California activities of a California resident. It impugned the professionalism of an entertainer whose television career was centered in California. The article was drawn from California sources, and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California.

*Id*. at 788-89.

In *Revell*, the Fifth Circuit applied this test to an article posted on a Columbia University internet bulletin board which claimed that the plaintiff, a Texas resident, was complicit in a terrorist attack. *Revell*, 317 F.3d at 468-89. The bulletin board allowed anyone to post materials and to subscribe. *Id*. at 470-72. The *Revell* Court held that Columbia University, a New York resident, was not subject to jurisdiction in Texas, because the article "contain[ed] no reference to Texas, nor does it refer to the Texas activities of [the plaintiff], and it was not directed at Texas readers as distinguished from readers in other states." *Id*. at 473.

The Fifth Circuit has also applied this test more recently in *Johnson*, where a Texas resident sued HuffPost in Texas for libel arising from an article posted on its website. *Johnson*, 21 F.4th at 316. The article claimed that the plaintiff was a

11

"noted Holocaust denier and white nationalist," but it "said nothing about Texas, nor did it rely on sources based in Texas or recount conduct that occurred in Texas." *Id.* Relying on its decision in *Revell*, the Fifth Circuit concluded Texas lacked personal jurisdiction over HuffPost because the allegedly libelous story had no ties to that State. *Id.* at 319. In doing so, the court rejected the plaintiff's attempt to distinguish *Revell* by pointing to the ads, merchandise, and offer for "an ad-free service 'on the same page as' the alleged libel" by noting that the plaintiff's libel claim in *Revell* did not arise from "Columbia's solicitation of subscriptions." *Id.*

The Fifth Circuit's decisions in *Revell* and *Johnson* compel a finding that this Court lacks personal jurisdiction over HuffPost. The Article at issue does not reference Mississippi, nor does it refer to the Mississippi activities of Evans or even mention that he is a Mississippi resident. Ex. 2 [1-2] at 1-4. Also, absent from the Complaint or the evidence submitted by the parties are any facts indicating that the anonymous source quoted in the Article is from Mississippi. *See generally* Compl. [1]; Ex. 2 [1-2]. Instead, the story focuses on events that occurred primarily in the North Bethesda, Maryland, area and, with respect to the eventual death of David Kennedy, in Florida, both places well-removed from Mississippi. Compl. [1] at 7-10; Ex. 2 [1-2] at 1-4. As the *Johnson* court recognized, Evans's burden at this stage is to "show that HuffPost's story targeted [Mississippi] in some way." *Johnson*, 21 F.4th at 320. Neither the facts as set forth in the Complaint nor the evidence presented in opposition of the Motion are sufficient to carry this burden.

d.   Evans's arguments in support of personal jurisdiction

The Complaint alleges that HuffPost targeted Mississippi through the sale of advertisements to Mississippi advertisers and through its premium subscription service.[2] Compl. [1] at 5. Evans argues that HuffPost's website utilizes an "interactive commercial advertising exchange" to direct advertisements to its users based on their location. Mem. [46] at 23-24. On this issue, the Complaint alleges that

> HuffPost . . . derives revenue from the sale of advertisements on its website, including revenue from Mississippi advertisers. Mississippi visitors to its website thereby cause an increase in advertisement revenue for HuffPost. The development and publication of its news articles, such as the article made the subject of this lawsuit, is an inherent part of HuffPost's business model of selling premium subscriptions to its website to Mississippi residents and further generating visitor traffic from Mississippi residents to its website, thereby increasing HuffPost's advertising revenue.

Compl. [1] at 5.

During the relevant time period, HuffPost engaged in two primary forms of advertising which both relied on data collected from its users: "reserved" advertising and "programmatic" advertising. Ex. 7 [45-7] at 11. Reserved advertisements were sold by HuffPost's parent company and appeared on HuffPost's website

---

[2] HuffPost briefly operated a paid membership program referred to as "HuffPost Plus." Ex. 4 [45-4] at 52; Ex. 1 [42-1] at 287. One of HuffPost's Rule 30(b)(6) corporate representatives, Victor Brand ("Brand"), testified that this was the only membership or subscription service HuffPost maintained during the relevant period and that it was started in April 2019, after the Article was published. Ex. 4 [45-4] at 52. Brand explained that the program is "currently suspended," *id.* at 53, and HuffPost has presented evidence that while the program was operational it had only one Mississippi subscriber, Evans's counsel, Ex. 1 [42-1] at 287. "For specific jurisdiction we look only to the contact out of which the cause of action arises." *Revell*, 317 F.3d at 472. Here, that is the publishing of an allegedly defamatory Article by HuffPost and not its solicitation of subscriptions for its premium membership program. As such this function of HuffPost's website does not support a prima facie case of personal jurisdiction.

"immediately" on a "guaranteed basis." *Id.* at 11, 14. Programmatic advertisements "are generally defined as an automated way of buying ad space in a dynamic bidded environment" where "inventory is negotiated and bidded against [by] other advertisers." *Id.* at 12.

Both forms of advertising can[3] utilize "information obtained from . . . [the] particular user," and during the relevant time period HuffPost did in fact display both types of advertisements based on the user's geolocation. *Id.* at 20, 33. HuffPost has provided a list of six entities which purchased reserved advertisements targeting users in Mississippi as well as other states. Ex. 3 [45-3] at 48-50. One of HuffPost's Rule 30(b)(6) corporate representatives, Michael Bohn, testified that the company lacked exact information on the number of programmatic advertisements sold, but he explained that the user's geolocation was included in the information transmitted to the advertising bidders. Ex. 7 [45-7] at 36-37; Ex. 3 [45-3] at 7 ("HuffPost has no data regarding advertisements placed programmatically . . . ."). Evans maintains that programmatic advertising "is how ads for Mississippi-only or Mississippi-centric companies targeting Mississippi residents found themselves on HuffPost's website." Mem. [46] at 13.

In *Johnson*, the Fifth Circuit rejected this argument advanced by Evans as insufficient to establish minimum contacts. *Johnson*, 21 F.4th at 320-21. Just as here, the plaintiff in *Johnson* argued that HuffPost's ad-based ties to Texas were

---

[3] Bohn testified that reserved advertisements may be displayed based on data obtained from a particular user, but the "primary method of reserved advertising doesn't involve any user data at all." Ex. 7 [45-7] at 20.

14

sufficient to show that HuffPost targeted Texas. *Id.* The Fifth Circuit noted, however, that the plaintiff's libel claim did not arise "from or relate to HuffPost's ads or the citizenship of those placing them," and that this "relatedness problem remains even if HuffPost used location data to tailor ads to each visitor." *Id.* at 321 (citing *Revell*, 317 F.3d at 472). The Fifth Circuit further explained that

> [w]hat matters is whether HuffPost aimed *the alleged libel* at Texas. Third-party ads on HuffPost's site reflect no such aiming. They neither caused nor relate to the harm that the story caused. They do not drive Texans to the site or even to the alleged libel. Instead, they direct Texans *away* from the site, to third-party advertisers. And HuffPost shows ads to all comers; it treats Texans like everyone else. To target every user everywhere, as those ads do, is to target no place at all.

*Id.* at 321-22 (emphasis in original) (footnotes omitted).

The result can be no different here. HuffPost's ad-based ties to Mississippi are insufficient to demonstrate that HuffPost targeted the alleged libel at Mississippi. The advertisements that HuffPost sells to "Mississippi-centric companies" are not the subject matter of Evans's claims and are irrelevant to this analysis. Mem. [46] at 13. Moreover, the fact that HuffPost tailors these advertisements to its users based on their location does not show that HuffPost targeted Mississippi. Instead, HuffPost, through its advertising scheme, "treat[s] [Mississippians] like everyone else." *Johnson*, 21 F.4th at 321.

Similar to the plaintiff in *Johnson*, Evans contends that HuffPost derives a significant portion of its revenue from this targeted advertising practice "and that without that data mining," it could not "survive as a business." Mem. [46] at 8, 24-25. This aspect of HuffPost's business model is also irrelevant to Court's inquiry.

15

*See Johnson*, 21 F.4th at 321. "The harm of libel is the reputational injury that results from the defendant's purposefully sharing that libel with others. It does not turn on whether the defendant's unrelated activities make or lose money." *Id*. (citation omitted). Thus, the revenue flowing to HuffPost from advertisements personalized to Mississippi residents "neither produced nor relate to [Evans's] libel claim." *Id*. at 321.

The Complaint also alleges that the Article was displayed publicly on HuffPost's website for four days, from September 20-24, 2018, in a form that defamed Evans. Compl. [1] at 7-14. Evans claims that "the exact number of Mississippi-based users who accessed HuffPost's website during" this critical period "and who were targeted with advertisements by HuffPost cannot be determined because HuffPost destroyed that information" despite notification that it was under a duty to preserve it. Mem. [46] at 13 (citing Ex. 8 [45-8] at 5-7). Evans contends that this evidence had "high jurisdictional relevance" as it would show the geolocation of HuffPost's users and prove that HuffPost targeted Mississippi residents with advertisements during this period. *Id*. at 13, 28. Pursuant to Federal Rule of Civil Procedure 37(e)(2), Evans asks the Court "to consider the evidence's destruction in its jurisdictional fact-finding." Mem. [46] at 28 (citing cases where courts invoked their authority under Federal Rule of Civil Procedure 37(e)(2)). HuffPost counters that this allegation is "baseless and reckless." Reply [49] at 5. HuffPost acknowledges that its "former affiliate" automatically deleted this data in

16

compliance with its document retention policy but explains that Evans never requested this purportedly critical data until January 2021. *Id.*; Ex. 1 [49-1] at 2-3.

Even if the Court were to consider such evidence, it would not change the result. Evans's libel claim does not arise out of HuffPost's advertising practices; instead it relates to a story involving his alleged involvement in the procurement of an illegal substance. As binding Fifth Circuit precedent, *Johnson* compels the conclusion that evidence of advertisements specifically tailored to Mississippi residents, even during the time period when the Article was published, would not demonstrate that the story targeted Mississippi. *Johnson*, 21 F.4th at 321.[4]

Evans next asserts that HuffPost has minimum contacts with Mississippi based on its "users enter[ing] into . . . legally binding contracts with HuffPost . . . in exchange for accessing their services." Mem. [46] at 23 (internal quotation marks omitted); *see also* Compl. [1] at 5 ("HuffPost . . . has entered into contracts with Mississippi residents to be performed in whole or in part in Mississippi."). Specifically, HuffPost's parent company's "Terms of Service" which were in effect during the relevant time period, provided that by accessing HuffPost's website, the user "agree[d] to these terms" which "form[ed] the entire agreement between" the parties. Ex. 5 [45-5] at 41; Ex. 4 [45-4] at 41. Evans argues that HuffPost visitors

---

[4] In his Memorandum [46] in Opposition, Evans also argues that HuffPost has sufficient minimum contacts with Mississippi based on its website allowing users to purchase products through its "shopping portal." Mem. [46] at 23-24. This argument is unavailing for two reasons. First, Evans did not plead that this Court had jurisdiction based on HuffPost's sale of merchandise to Mississippi residents. *See generally* Compl. [1]; *Johnson*, 21 F.4th at 319 (recognizing that a basis for establishing jurisdiction not raised in the complaint cannot support personal jurisdiction). In addition, this argument cannot succeed for the same relatedness concerns as with the advertising argument. HuffPost's sale of merchandise "has nothing to do with [Evans's] libel claim," and it is insufficient to support personal jurisdiction. *Id.* at *5.

17

agreed to waive certain rights in order to access HuffPost services. Mem. [46] at 24. Among these were the right to bring a class action and the right to a jury trial. Ex. 5 [45-5] at 41. Evans maintains that "[t]his bargained-for exchange" created an "inherently commercial" relationship between HuffPost and its users, thereby establishing the requisite minimum contacts.

Contrary to Evans's assertions, *Johnson* made it clear that claim-specific personal jurisdiction must arise "from the defendant's forum ties that relate to the plaintiff's claim." *Johnson*, 21 F.4th at 323. It is not enough that HuffPost had a contractual relationship with every user in the United States, including its Mississippi visitors.[5] *See Admar*, 18 F.4th at 787 ("[A] defendant does not have sufficient minimum contacts with a forum state just because its website is accessible there."). Instead, under *Calder*, *Revell*, and *Johnson*, there must be evidence that the defendant specifically directed his tortious conduct at the forum. *See Johnson*, 21 F.4th at 231; *Revell*, 317 F.3d at 475. Because there is no connection between HuffPost's terms of service and the allegedly defamatory statements at issue in the Complaint, HuffPost's contractual relationship with its Mississippi users will not support the exercise of personal jurisdiction in this case.

Finally, the Court's exercise of jurisdiction over HuffPost would not comport with traditional notions of fair play and substantial justice. Under this element of specific jurisdiction, the defendant must have a "fair warning," which entails

---

[5] HuffPost has presented evidence that its Mississippi users account for a small portion of its overall visitor base. Reply [49] at 2; Ex. 2 [49-2] at 2 (stating that only 7,567 of the 3,271,969 average daily visitors to HuffPost website in August of 2019 had ISP addresses traceable to Mississippi).

18

"knowledge that 'a particular activity may subject [it] to the jurisdiction of a foreign sovereign.'" *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1025 (2021) (alteration in original) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). The defendant must also have an opportunity to "lessen or avoid exposure to a given State's courts" by structuring its conduct accordingly. *Id.* (quoting *World-Wide Volkswagen*, 444 U.S. at 297); *see also Johnson*, 21 F.4th at 320 (recognizing these two elements in assessing fairness).

Here, nothing about HuffPost's ties to Mississippi would give it reason to believe that it would be subject to a libel suit in Mississippi. HuffPost neither aimed the Article at Mississippi, nor did it reach "into [Mississippi] to solicit the plaintiff's visit, without which the tort could not have occurred." *Johnson*, 21 F.4th at 322 (explaining that these activities might create specific jurisdiction). As to the second element of this inquiry, HuffPost need "not block [Mississippians] from visiting its site, receiving relevant advertising, or buying T-shirts to escape the ability of [Mississippi] courts to hear [Evans's] libel claim." *Id.* at 323. Instead, it is enough that HuffPost did not purposely direct at Mississippi the conduct about which Evans complains. *Id.* As such, for this Court to exercise jurisdiction over HuffPost would not be "fair and reasonable." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006).

In sum, neither the facts as set forth in the Complaint, nor the jurisdictional evidence adduced during discovery, show that HuffPost's story targeted Mississippi in any way, that Evans's injuries arose from HuffPost's contacts with Mississippi, or

that exercising jurisdiction over HuffPost would be fair and reasonable. *Johnson* dictates the result that the Court lacks personal jurisdiction over HuffPost, and its Motion [42] to Dismiss should be granted.

### III. CONCLUSION

To the extent the Court has not specifically addressed the parties' remaining arguments, it has considered them and determined that they would not alter the result.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, Defendants Huffington Post.Com, Inc., and Ashley Feinberg's Motion [42] to Dismiss for Lack of Personal Jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) is **GRANTED**.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, Plaintiff Derrick Evans's claims against Defendants Huffington Post.Com, Inc., and Ashley Feinberg are **DISMISSED WITHOUT PREJUDICE** for lack of personal jurisdiction. A separate Final Judgment will issue in accordance with Federal Rule of Civil Procedure 58.

**SO ORDERED AND ADJUDGED**, this the 27th day of April, 2022.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE